UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TAMARA LYNN MALONE,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No.  13-cv-04708-JCS

**ORDER RE MOTION FOR SUMMARY JUDGMENT AND MOTION FOR REMAND**

Re: Dkt. Nos. 15, 22

## I.       INTRODUCTION

Plaintiff Tamara Lynn Malone ("Plaintiff," "Malone") seeks review of the final decision of the Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for disability benefits under the Social Security Act.  Plaintiff moves for summary judgment, asking the Court to reverse the Commissioner's denial of benefits and remand with instructions to award benefits, or, in the alternative, for further administrative proceedings.  Dkt. No. 15 ("Motion").  Defendant moves to remand for further administrative proceedings.  Dkt. No. 22 ("Def. Motion").  For the reasons stated below, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS IN PART Defendant's Motion for Remand.

## II.      BACKGROUND

### A.      Procedural Background

Plaintiff applied for disability benefits on January 19, 2011, alleging that she had been disabled since June 1, 2008.  Administrative Record ("AR") at 163–64.  On appeal to the Appeals Council, Plaintiff requested that her alleged onset date be amended to January 1, 2010. AR at 263. Plaintiff's application was denied April 8, 2011.  AR at 78-84.  Plaintiff submitted a request for

United States District Court
Northern District of California

United States District Court
Northern District of California

reconsideration, which was denied May 27, 2011.  AR at 86–90.  Plaintiff subsequently submitted a request for a hearing by an Administrative Law Judge; a hearing was scheduled for September 21, 2011, and continued to November 7, 2011.  AR at 31-77.  At the November 7 hearing, Administrative Law Judge Kristine Kwan ("ALJ") and Plaintiff's attorney representative questioned Plaintiff and a vocational expert.  AR at 13, 38–77.  The ALJ wrote a decision dated December 30, 2011 on behalf of the Social Security Administration, finding Plaintiff not disabled and denying Plaintiff's claim.  AR at 14–30.  Plaintiff requested a review of the ALJ's decision, and on August 10, 2013 the Social Security Administration's Appeals Council declined to grant the request for review.  AR at 1–5.  The Appeals Council's action resulted in the ALJ's decision becoming the agency's final decision.

Plaintiff filed this action on October 9, 2013 under 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the final decision of the Commissioner.  Plaintiff has filed a motion for summary judgment, and Defendant has filed a motion to remand for further proceedings.  Dkt. Nos. 15, 22.  This action was reassigned to the undersigned magistrate judge, and the parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

**B.    The Administrative Hearing**

Plaintiff, her attorney representative, and a vocational expert appeared before the ALJ on November 7, 2011.  AR at 31-77.  The ALJ confirmed that Plaintiff's attorney did not have any objections to evidence in the file and admitted exhibits into the record.  *Id.* at 40–41.  The ALJ then questioned Plaintiff about her home life, work history, and medical conditions, including physical limitations as they impacted her previous work and mental and emotional issues.  *Id.* at 31–77.  The ALJ asked Plaintiff about her most recent employment, which ended June 1, 2008, her engagement with state agencies, and her ongoing search for work.  *Id.* at 42–46.  Plaintiff testified that she was "on Disability at first" after her last job, *id.* at 45, and received a settlement payment of $40,000 related to a workers' compensation case for her colitis on the basis that it was stress-induced.  *Id.* at 44–48.  The ALJ clarified that the settlement did not include continuing health insurance, and Plaintiff responded, "No.  I needed the money."  *Id.* at 48–49.  Plaintiff testified that she "wouldn't have a choice at this point" but to take a job if offered to her, but that

2

1   she "wouldn't be able to keep it" because she "would be absent from that job" because of her

2   colitis.  *Id.* at 45–46.

3           Plaintiff testified that at the time of the hearing she was being treated by Elizabeth

4   Maritano, a physician's assistant, for her colitis, and had been treated by Dr. Heather Pachiatti

5   before her health insurance ended in December 2010 as part of the settlement of her workers'

6   compensation claim.  *Id.*  The ALJ Plaintiff testified that she took "Pepto Bismol or Imodium" for

7   her colitis and that she had tried sulfates but had an adverse reaction.  *Id.* at 47–48.  She testified

8   that she also was taking "Norco," which "helps with the colitis symptoms" though it was

9   prescribed for an unrelated ankle injury.  *Id.*

10          Asked by the ALJ if there is "any other reason that keeps you from working?" Plaintiff

11  testified that she has "a hard time with keeping at [the] task at hand," and "that makes it difficult to

12  work" and "[i]t makes it difficult at home."  *Id.* at 49.  She testified that she had been treated by

13  Dr. Leyla Brusatori, a psychologist, with sessions at first once a week and later once a month, but

14  she could no longer afford to see her.  *Id.* at 49–50.  Previously she had been treated by Dr. Valerie

15  Fox.  *Id.* at 51.  Plaintiff testified that in addition to the medications described above, she also

16  takes Prozac, Klonopin, Trazodone, and Flonase, with no side effects.  *Id.* at 50–51.

17          The ALJ then asked Plaintiff about her typical day.  Plaintiff responded, "I just recently

18  relocated after living in a house for 20 years, and so, I'm trying to put my house together.  I have

19  several animals that I have to care of . . . ."  *Id.* at 52.  She testified that she and her husband care

20  for 20 cats and four dogs, in two kennels that they made from a converted sunroom in their new

21  home, and that her son helps her with the animals as well.  *Id.* at 52–54.  She also described basic

22  chores she does around the house, the difficulty she has with some activities like cleaning floors,

23  and the pain she experiences when driving.  *Id.* at 54–55.

24          Plaintiff then described her colitis symptoms.  She said she has "flare ups . . . at least once

25  a week," which can "last up to three days," or could start in the afternoon and be over by the

26  evening.  *Id.* at 55–56.  She said she takes Norco, Pepto Bismol, and Imodium for the symptoms,

27  has tried Entocort, and that she is supposed to eat "bland" food, which she does "when [she] can."

28  *Id.* at 56–57.  She has been recommended to see a specialist, but when the ALJ asked if she makes

United States District Court
Northern District of California

United States District Court
Northern District of California

"any special, additional appointments with the doctor" when she has "a flare-up, Plaintiff responded that she "just take[s] care it [her]self." *Id.* at 58.  Questioned by her attorney, Plaintiff stated that the first onset of her colitis was in 2004, and that she would have symptoms during the workday. *Id.*  She had to use the restroom up to ten times per day with no warning, and when the symptoms presented at night, she would be tired the next day. *Id.* at 58–59.  She testified that she left her job as a medical secretary and subsequently worked as an administrative assistant, and she "left that job, because [she] was missing too much work due to the colitis." *Id.* at 59.  After working part-time at a veterinarian's office "a couple days a week," she apparently took a full-time job there, but "only lasted there about three [months]." *Id.*  She subsequently worked as a file clerk "and they let me go due to the absences." *Id.*

Plaintiff next described her depression.  She said it can be "debilitating," but that she also has "manic episodes," and affirmed that she has "good days and bad days for [her] depression" when asked. *Id.*  She said she can go about her normal routine on a good day, but on a bad day she "stay[s] in bed," or that she has to "force [her]self to do everything." *Id.*  She testified that she has "had this for all my life," and that her recent move has "helped the depression." *Id.*

After hearing testimony from Plaintiff, the ALJ questioned the vocational expert ("VE") about the availability of jobs Plaintiff could perform, given her limitations, and the transferability of Plaintiff's skills from past work to those jobs.  AR at 61–76.  The vocational expert testified that Plaintiff's past work—as an accounts receivable clerk, medical secretary, administrative assistant, administrative clerk, and receptionist—were all semi-skilled or skilled sedentary positions in the Dictionary of Occupational Titles, with a specific vocational preparation ("SVP") range of 4–7, though as the Plaintiff performed them the vocational expert stated they in fact were light work. *Id.* at 62–63.  The VE testified that the skills from these positions "would easily all transfer to the semi-skilled range of general office clerk, that kind of thing," *id.* at 63, and indicated that there were many such jobs available in that category.  "[B]ut outside of that range, in and around administration clerical work," the skills would not transfer. *Id.* The VE provided the example of a "general clerk"—with either an SVP of 3 classified as light work, or an SVP of 4 classified as sedentary work—for which Plaintiff's skills would be transferable, and suggested that

1   position was exemplary of numerous similar jobs.  *Id.*

2       The ALJ next posed hypotheticals to the VE about the Plaintiff's ability to perform certain

3   jobs with certain restrictions.  First, the ALJ asked if "an individual with claimant's age,

4   education, and background," and "no exertional restrictions," but who would be "off task . . . five

5   percent of the time" could perform any of Plaintiff's past work.  *Id.* at 64.  The VE responded,

6   "Yes, I believe so."  *Id.*  Responding to a second hypothetical, the VE testified that past work

7   could be still be performed at the same off-task percentage with additional limitations of "standing

8   and talking a total of four hours in an eight-hour day."  *Id.* at 64–65.  When Plaintiff's attorney

9   posed a variation on that hypothetical in which the worker would be absent three times per month,

10  unscheduled," *id.* at 66, the VE responded, "certainly, no employer is going to tolerate this level of

11  absences, just beyond anything that would be considered industry standard."  *Id.*

12      Removing the three-day absence factor, and returning to just the time off task, Plaintiff's

13  attorney next asked about the same hypothetical but with off-task time increased to "30 minutes

14  per day, approximately," the VE responded:

15  A: . . . with some of these jobs we're going to lose them.
    Q: Okay.
16  A: However, I believe there would still be other work available.
    These jobs do have a certain level of responsibility and accuracy
17  attached to them. I think five percent would be acceptable, but I
    think at ten percent, especially when you're talking about jobs like
18  medical secretary, administrative assistant, receptionist, I think they
    would be [INAUDIBLE]

19  *Id.* at 66.  The VE indicated that other, "production-oriented" work could still be performed, as

20  opposed to the semi-skilled "clerically-oriented task[s]" that would apparently be precluded, "with

21  that level of erosion."  *Id.* at 67.  The attorney's follow-up question and the VE's answer

22  confirmed that "past relevant work would be out" at the ten percent off-task threshold, but that

23  production-oriented work "would still be on the table."  *Id.* at 68.  However, if the hypothetical

24  worker was unable to perform "tandem work," then even considering the availability of

25  production-oriented jobs the worker would be "unskilled" according to the VE.  *Id.* at 68–72.  The

26  VE also responded to additional hypothetical questions that varied on that theme.  The VE

27  testified that "a person . . . working at an unskilled level . . . off task . . . 30 minutes a day" would

28  "still [be] within acceptable tolerances."  *Id.* at 73.  However, if that same hypothetical worker

United States District Court
Northern District of California

United States District Court
Northern District of California

"[w]ould require extra supervision of an additional 30 minutes of supervision a day, and would require written instructions for all tasks," the VE testified that he did not "think it's going to fly with these entry level production jobs" after "the first 30 days." *Id.* at 75. And when asked if there would be any jobs available if the hypothetical worker "were off task for one hour per day," the VE testified:

> Yeah, we're right at the edge of the hour a day. I mean, you know, I'm talking in terms of 10 and 15 percent. And, you know, 10 percent of a 480 hour workday is 48 minutes. So, I mean, you push it up to an hour, and you're -- you know, you're maybe around 12 percent or so. I'm not trying to, you know, really be that concise, but my suggestion is that if you're missing more than, say, an hour's worth of production during the course of a day, I think you're getting very close to the edge here.
> . . . .
> You know, there's no documentation out that says that 15 percent is the absolute[]. But I am suggesting to you that if you have a person that's going to be off task as much of an hour a day in terms of their output, that that's the line.

*Id.* at 75–76.

## III.  THE ALJ'S FIVE-STEP ANALYSIS

### A.  Legal Standard for Determination of Disability

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At step one, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."

United States District Court
Northern District of California

20 C.F.R. § 404.1520(a)(4)(I).  If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this step.  If it is determined that one or more impairments are severe, the Commissioner will next perform step three of the analysis: comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled.  Otherwise, the Commissioner proceeds to step four and considers the claimant's residual functional capacity ("RFC") in light of his impairments and whether he can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it").  If the claimant can still perform past relevant work, he is found not to be disabled.  If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis.  20 C.F.R. § 404.1520(a)(4)(v).  At step five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997).  A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits.  20 C.F.R. § 404.1520(f).  Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id.*

**B.    The ALJ's Analysis**

**1.    Step 1: Substantial Gainful Activity**

The ALJ concluded that Plaintiff "did not engage in substantial gainful activity during the

7

period from her alleged onset date of June 1, 2008 through her date last insured of December 31, 2010" *Id.* at 19.

### 2. Step 2: Severe Impairments

The ALJ determined that "[t]hrough the date last insured, [Plaintiff] had the following severe impairments: colitis and depressive disorder." *Id.*

### 3. Step 3: Medical Severity

The ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." *Id.*

### 4. Step 4: Residual Functional Capacity

The ALJ found that:

> through the date last insured, the claimant had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a). The claimant has no limitations in her ability to sit for extended periods of time, can stand for a total of four hours in an eight hour day, and can be off task up to five percent of a typical workday due to nonexertional limitations.

*Id.* at 21.

In reaching this conclusion, the ALJ considered Plaintiff's testimony at the hearing, written statements from Plaintiff and Plaintiff's husband, Plaintiff's medical and treatment records, a medical records review by a medical examiner, and testimony by a vocational expert. The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," *id.* at 22, but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* The ALJ described factors from Plaintiff's work history (including the end of her previous job, her worker's compensation claim and settlement, and her ongoing job search), home life (including caring, with her husband, for up to 20 cats and four dogs), deviation from her prescribed diet, medication history, and her medical records in determining that Plaintiff's claims as to the intensity, persistence, and limiting effects of the alleged symptoms were not credible. *See id.* at 22–25.

The ALJ particularly described Plaintiff's medical history and records with regard to four

1    doctors:

2         Dr. Elizabeth Shaw, M.D.  AR at 24; *see* AR at Ex. 16F (pp.611–616).  Dr. Shaw co-

3    signed a "colitis medical source statement" with a physician's assistant,[1] dated October 25, 2011.

4    The medical source statement is a four-page form with checkboxes for several questions and

5    blanks for short (0-2 line) handwritten responses.  *See* AR at Ex. 16F.  The ALJ describes Dr.

6    Shaw as Plaintiff's "treating doctor" (the form indicates Dr. Shaw treated Plaintiff starting April 7,

7    2011, AR at 612) and gives "**significant weight** . . . to the findings overall as it is supported by the

8    medical evidence of record."  AR at 24 (emphasis added).  The ALJ described Dr. Shaw's findings

9    as follows:

         [C]laimant is not currently taking any medications for colitis, and . .
10       .  emotional factors do not contribute to the claimant's symptoms
         and functional limitations. They opined that the claimant is capable
11       of sitting at least 6 hours; standing/walking about 4 hours; can lift
         and carry frequently up to 10 pounds and occasionally 20 and 50
12       pounds; claimant may likely be off task 5% of the work day due to
         her symptoms; claimant is capable of low stress jobs due to having
13       intermittent symptoms due to stress.

14   *Id.* (citations omitted).  Dr. Shaw's medical source statement in fact stated that claimant may likely

15   be off task *10%* of the work day, as discussed below.  AR at 614.   Additionally, the ALJ "gives

16   **no weight** to the opinion that the claimant would miss three days per month as it is purely

17   speculative and without any rationale."  AR at 24 (emphasis added); *see* AR at 614 (response to

18   question 12(m), checking the box for "About three days per month").

19        Dr. Leyla Brusatori, Ph.D.  AR at 24; *see* AR at Ex. 15F/7 (p. 606), Ex. 17F (pp. 617–622).

20   Dr. Brusatori's records referenced by the ALJ include a one-page "progress note entry" and a

21   "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental

22   Impairment" *id.*, and are part of what the ALJ calls the "very limited records" concerning

23   Plaintiff's mental health treatment.  AR at 24.  The ALJ cites the progress note entry as indicating

24   Plaintiff's mental health was good, or at least improving, as of the date of the appointment,

25   September 29, 2011.  *Id.*  The ALJ contrasts the progress note entry with Dr. Busatori's medical

26   source statement, dated October 26, 2011, which found "several moderately severe limitations in

27

28   _____
     [1] The name of the physician's assistant is illegible on the form.  *See* AR at 615.

United States District Court
Northern District of California

three of four areas of functioning," and which diagnosed Plaintiff with a Global Assessment of Functioning ("GAF") score of 50. *Id.* at 617–622. The ALJ calls the contrast between the progress note entry and the medical source statement "perplexing." *Id.* at 24. The ALJ describes Dr. Brusatori's diagnoses (including, e.g., "major depressive disorder, recurrent") as "without any explanation or rationale for the dramatic change." *Id.* The ALJ gives Dr. Brusatori's medical source statement "**limited weight**," *id.* (emphasis added), on the basis that it

> is not consistent nor supported by Dr. Brusatori's [sic] contemporaneous evidence or anywhere else in the substantial medical record. Specifically, the doctor noted that the claimant was not taking any of her psychiatric medications in October of 2011. Further, the depression and anxiety screenings were negative. Lastly, there is no explanation or support for how Dr. Brusatori's findings are relevant since 2007, especially since, as she says she began seeing the claimant just 6 months ago. . . . Moreover, Dr. Brusatori concedes much of claimant's problems are merely situational with financial instability.

*Id.* (citations omitted).

Dr. Hosein Tahami, D.O., Q.M.E. AR at 24–25; *see* AR at Ex. 3F (pp. 385–520). Dr. Tahami "provided several reports in August 10, 2008, October 31, 2007, March 2, 2007, and January 30, 2007 (the last three reports dated prior to the alleged onset date) in connection with [Plaintiff's] worker's compensation claim." AR at 24 (citation omitted). The ALJ discusses Dr. Tahami's records as relevant to Plaintiff's depression claim, as the worker's compensation claim was for mental health effects related to leaving her November 2006 job. The ALJ cites Dr. Tahami's review of records and his conclusions in 2007 that Plaintiff "was not temporarily totally disabled based on psychiatric illness or symptoms" by the events that led to her worker's compensation claim, and that Plaintiff "'can actually benefit from returning to some type of employment'" (quoting Dr. Tahami directly). *Id.* (citations omitted). The ALJ also notes that in October 2007, Dr. Tahami stated that "new medical records do not change his opinion from the previous report." *Id.* The ALJ does not explicitly state the weight given to Dr. Tahami's conclusions—only that "**[c]onsideration was . . . made.**"

Dr. Valerie Fox, Ed.D. AR at 25; *see* AR at Ex. 3F (pp. 486–489). The ALJ discusses Dr. Fox's psychological treatment records, dated from December 2008 to August 2010, in the context of his discussion of Dr. Tahami. AR at 25. The ALJ cites Dr. Fox's records as diagnosing

10

1   Plaintiff with "'major depression, recurrent (mild) with GAF scores ranging from 58 to 65.2," as

2   noting "significant periods of absence from therapy," and as indicating that Plaintiff "continues on

3   Prozac and Klonopin and . . . looking for part-time work with a good prognosis with treatment."

4   AR at 25 (citations and footnote omitted).  The ALJ does not assign a particular weight to Dr.

5   Fox's records.

6               **5.  Step 5: Ability to Perform Other Jobs in the National Economy**

7         The ALJ concluded that:

> [t]hrough the date last insured, the claimant was capable of
> performing past relevant work as a receptionist, accounts receivables
> clerk, medical secretary, administrative assistan[t], and
> administrative clerk. This work did not require the performance of
> work related activities precluded by the claimant's residual
> functional capacity.

11  AR at 25.  The ALJ states that she compared Plaintiff's RFC with the physical and mental

12  demands of this work and found that Plaintiff would be able to perform it.  *Id.*  The ALJ also cites

13  to the vocational expert's testimony as supporting the conclusion that Plaintiff "could perform the

14  job of receptionist, accounts receivables clerk, medical secretary, administrative assistan[t], and

15  administrative clerk as generally performed relying on the Dictionary of Occupational Titles in

16  accordance with our regulations."  *Id.*

17              **6.  Conclusion**

18        The ALJ therefore concluded that Plaintiff "was not under a disability, as defined in the

19  Social Security Act, at any time from June 1, 2008, the alleged onset date, through December 31,

20  2010, the date last insured."  AR at 25.

21  **IV.    THE PLEADINGS**

22        **A.    Plaintiff's Motion for Summary Judgment**

23        Plaintiff filed a complaint seeking review of the ALJ's decision, and moved for summary

24  judgment on the grounds that the ALJ "did not properly assess [Plaintiff's] RFC," and erred at step

25  4 and step 5.  Motion at 9.  Plaintiff argues that the ALJ, in reaching her conclusion as to

26  Plaintiff's RFC, improperly rejected Plaintiff's testimony and certain medical evidence

27  (particularly from Dr. Brusatori and Dr. Shaw).  Plaintiff argues that based on those errors, the

28  ALJ incorrectly assessed Plaintiff's RFC, ability to perform past work and other jobs in the

United States District Court
Northern District of California

11

1    national economy.  *Id.*

2        Plaintiff argues that the Court should credit the improperly rejected evidence as true under

3    9th Circuit precedent, and that the evidence, so credited, establishes that Plaintiff is disabled at

4    Step 5.  Motion at 9.  Plaintiff claims that with Plaintiff's RFC properly determined, the VE's

5    testimony supports Plaintiff's position that Plaintiff does not have skills transferable to jobs within

6    her RFC, and that the Court should therefore remand for immediate award of benefits.  *Id.*

7                    **1.   The ALJ Improperly Rejected Dr. Shaw's Opinions**

8        Plaintiff argues that "the ALJ inaccurately found Dr. Shaw had opined that Mrs. Malone

9    'may likely be off task 5% of the work day due to her symptoms,'" Motion at 10 (citing AR at

10   614), whereas Dr. Shaw's medical source statement actually states that Plaintiff "is likely to be off

11   task 10% of the workday."  *Id.*  Plaintiff argues that if Dr. Shaw's opinion is credited as true, the

12   VE's testimony establishes that Plaintiff is disabled since the VE testified that at 10% off-task per

13   day, Plaintiff cannot perform her past relevant work or any related clerical work (the only semi-

14   skilled work to which the VE found she has transferable skills).  *Id.* at 10–11.  And if limited to

15   unskilled work at sedentary exertional level, given her age and education, Plaintiff argues that she

16   would be disabled under Medical-Vocational Guideline 201.14.  *Id.* at 11.

17       Plaintiff additionally claims that the ALJ improperly "rejected Dr. Shaw's opinion that

18   [Plaintiff] 'would miss three days per month,'" arguing that the ALJ's basis for the rejection—stating

19   that opinion "is purely speculative and without any rationale"—is invalid.  *Id.* at 11–12 (quoting AR at

20   24).  Plaintiff argues for the ALJ to reject a medical opinion on the basis of being speculative, it was

21   the ALJ's duty to conduct further inquiry into the matter.  Motion at 12.

22       Plaintiff additionally argues, without further context, that the ALJ improperly rejected Dr.

23   Shaw's opinions that:

24          (1) Mrs. Malone needed a job that permits ready access to a
            restroom, (2) that she would need to take unscheduled restroom
25          breaks during the workday at an unpredictable frequency, (3) that
            Mrs. Malone would be away from the work station 20-30 minutes for
26          an average unscheduled restroom break, and (4) she would have little-
            to-no advance notice of the need for a restroom break.

27   *Id.* at 11–12.

28       In addition to arguing that the ALJ's rejection of Dr. Shaw's opinion was improper,

United States District Court
Northern District of California

Plaintiff also affirmatively argues that Dr. Shaw's opinions are supported by Plaintiff's medical records "from Kaiser," which Dr. Shaw reviewed. *Id.* at 12. Plaintiff cites to a June 11, 2008 progress note by Dr. Heather Paciotti as supporting Dr. Shaw's opinion regarding Plaintiff's inability to stay on-task and work a full schedule. *Id.* (citing AR at 318–19 (which states that Plaintiff "has not been able to work 8 hour days, will loose [sic] job in 3 weeks" in the history of patient illness section, and that Patient "feels . . . [she] is unable to work more then [sic] 32 hours/week" in the Assessment & Plan section"). Plaintiff additionally cites to two notes from Dr. Tahami's records that indicate Plaintiff had to quit her job in June 2007 due to excessive absences. Motion at 12.

### 2. If Dr. Shaw's improperly rejected opinions are credited as true, the Court should remand for payment of benefits

Plaintiff argues that the "ALJ's failure to give clear and convincing reasons, or even specific, legitimate reasons for rejecting Dr. Shaw's opinions results in the Court crediting those opinions 'as a matter of law.'" Motion at 12 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). Plaintiff argues if Dr. Shaw's opinions are credited as true, "there are no outstanding issues that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find [Plaintiff] disabled were such evidence credited," and therefore the Court should remand for benefits. Motion at 12.

Plaintiff makes two arguments in support of this outcome. First, if Dr. Shaw's opinion that Plaintiff would be absent from work three times per month is credited as true, Plaintiff is disabled based on the VE's testimony that "no employer is going to tolerate this level of absences." *Id.* (citing AR at 66). Second, if Dr. Shaw's opinion that Plaintiff would be off task 10% of the work day is credited as true, the VE testified that Plaintiff would be limited to sedentary work, and would be disabled under Medical-Vocational Guideline 201.14. *Id.*

### 3. The ALJ Improperly Rejected Dr. Brusatori's Opinions

Plaintiff's next claims that the ALJ's rejection of Dr. Brusatori's opinions in her medical source statement—on the basis that it contradicted Dr. Brusatori's progress note entry from a month earlier and was "perplexing"—was invalid. Plaintiff argues that the ALJ's "rationale is not

13

United States District Court
Northern District of California

1    a valid basis for rejecting Dr. Brusatori's opinions." Motion at 14.   Plaintiff argues that the ALJ

2    misconstrues the progress note entry as being more positive than it actually was, and argues that

3    the medical source statement, despite identifying three moderately severe limitations, did "not

4    express any dramatic change" from the earlier note. *Id.* at 14–15.  Plaintiff argues that the

5    progress note entry's description of Plaintiff saying that her recent move to a new house was "the

6    best thing that ever happened" was in fact only describing a "silver lining," and in any event was

7    not inconsistent with the type of limitations described in the later medical source statement,

8    because all of those limitations "address [Plaintiff's] inability to deal with work stressors." *Id.*

9           In addition to arguing that the ALJ's rejection of Dr. Brusatori's "opinion that [Plaintiff]

10   has the above-stated moderately severe restrictions" was improper, Plaintiff also affirmatively

11   argues that Dr. Brusatori's "opinion is supported by the medical records and [Plaintiff's] work

12   history." Motion at 15.  Plaintiff refers to Dr. Tahami's citation to a performance evaluation from

13   April 2006 that described Plaintiff's "reluctant[ance] to accept supervision, new policies and

14   projects" and "[e]motionally charged responses to personnel and workplace stressors." *Id.* (citing AR

15   at 391).  Plaintiff also cites to a letter from her supervisor at that same job "requir[ing] proof of illness

16   or medical appointments for those who show a pattern of possible sick leave abuse," *id.*, and notes that

17   Plaintiff "has lost jobs because of restrictions as assessed by Dr. Brusatori." *Id.* (citing AR at 493).[2]

18          Next, Plaintiff argues that the ALJ's finding that "[Dr. Brusatori's] moderately severe ratings

19   and the GAF score of 50 is not consistent nor supported," AR at 24, is mistaken.  Motion at 15–16.

20   Plaintiff cites to Dr. Tahami's evaluation of Plaintiff "as having a GAF of 50 on January 30, 2007."

21   Motion at 16 (citing AR at 418).  Plaintiff cites to a definition of a GAF score of 50[3] and to several 9th

22   Circuit cases suggesting that a "GAF score of 50 is consistent with disability."  Motion at 16.

23

---

24   [2] Dr. *Tahami's* psychiatric evaluation at that pincite indicates that Plaintiff started and *quit* several
     jobs because of her *physical symptoms*, apparently referring to colitis-related symptoms.  AR at

25   493.  Plaintiff indicated on her Function Report that she has never been "fired or laid off from a
     job because of problems getting along with other people."  AR at 216; *but see* TR at 43 (Plaintiff's

26   last job "ended due to my being absent too many times, and they told me they had to let me go
     because they needed a person to be there eight hours a day").

27   [3] "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any
     serious impairment in social, occupational, or school functioning** (*e.g.*, no friends, unable to keep a

28   job)."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision
     (2000)(DSM-IV-TR), page 34.

14

United States District Court
Northern District of California

1    Plaintiff next disputes the ALJ's rejection of Dr. Brusatori's opinions on the ALJ's basis that

2    "the doctor noted that the claimant was not taking any of her psychiatric medications in October of

3    2011" and that "the depression and anxiety screenings were negative."  AR at 24; *see* Motion at 16.

4    Plaintiff argues that the ALJ appears to have misinterpreted a medical record note by one Elizabeth

5    Martorana, a Physician's Assistant, that referred to Plaintiff not taking her medication for her varicose

6    veins and plantar fasciitis.  Motion at 16.

7    Plaintiff next disputes the ALJ's rejection of Dr. Brusatori's opinions on the ALJ's basis that

8    "there is no explanation or support for how Dr. Brusatori's findings are relevant since 2007, especially

9    since, as she says she began seeing the claimant just 6 months ago."  AR at 24.  Plaintiff notes that Dr.

10   Brusatori reviewed Plaintiff's medical records.  Motion at 16 (citing AR at 621).

11   Plaintiff finally disputes the ALJ's rejection of Dr. Brusatori's opinions on the basis that "Dr.

12   Brusatori concedes much of claimant's problems are merely situational with financial instability."  AR

13   at 24 (citing Ex. 15F).[4]  Plaintiff argues that this is an unfair characterization of Dr. Brusatori's

14   opinion, which is actually that "[s]ymptoms of her condition are exacerbated by significant stressors,

15   such as financial or economic instability."  AR at 621 (Ex. 17F).   Plaintiff also argues that "one aspect

16   of Mrs. Malone's mental illness actually *causes* these significant stressors," and argues that what the

17   ALJ called "situational" has in fact lasted for years for Plaintiff.  Motion at 16 (emphasis in original).

18          **4.  If Dr. Brusatori's improperly rejected opinions are credited as true, the
             Court should remand for payment of benefits**

19

20   Plaintiff argues if Dr. Brusatori's opinions are credited as true, remand for benefits is required

21   for two reasons.  First, Plaintiff suggests that crediting as true "Dr. Brusatori's opinion that [Plaintiff]

22   has a moderately severe limitation in the ability to complete a normal workday and workweek without

23   interruptions from psychologically based symptoms and to perform at a consistent pace without an

24   unreasonable number and length of rest periods" is equivalent to the three unscheduled absences per

25   month that the VE testified "no employer is going to tolerate."  Motion at 18.  Second, Plaintiff argues

26

27   [4] Ex. 15F is a series of records signed by Martorana, the physician's assistant noted above, and
     two other caregivers.  It is not clear if the ALJ cited to Ex. 15F in error, and intended to cite to Ex.

28   17F instead (Dr. Brusatori's medical source statement), as Plaintiff apparently believes. *See*
     Motion at 16.

that "Dr. Brusatori's opinion, if credited, establishes that [Plaintiff] is disabled because she has a substantial loss of her ability (on a sustained basis) to: (1) respond appropriately to supervision, co-workers and usual work situations, and (2) deal with changes in a routine work setting," and therefore is disabled under Social Security Rulings 85-15 and 96-9p.  *Id.*

### 5.  The ALJ Improperly Rejected the Credibility of Plaintiff's Statements

Plaintiff argues that the ALJ's finding that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC determination, AR at 22, was improper because the ALJ did not "make specific, clear, and convincing findings to support the adverse credibility determination." Motion at 20.  Plaintiff disputes three sections of the ALJ's decision that Plaintiff identifies as challenging Plaintiff's credibility as to the intensity and severity of Plaintiff's symptoms.  *Id.*

First, Plaintiff disputes the ALJ's finding that there are "discrepancies" between the Plaintiff's statements regarding her inability to "keep a job because of her colitis," the end of her last job in 2008, and her ongoing job search.  AR at 22.  Plaintiff argues that the ALJ "mischaracterized" the reason that Plaintiff's last jobs ended as being "due to work stress" when it was actually due to Plaintiff being absent too many times.  Motion at 20.  Plaintiff also argues that neither her ongoing search for work (online, approximately once per week) nor her settlement of her worker's compensation claim for a monetary payout with no continuing health insurance is inconsistent with her claims regarding how her previous jobs ended, her symptoms, or her ability to return to work.  Motion at 20–22.  Plaintiff argues that the medical record is consistent with her claims that she has been seeking work and "[t]here is nothing about Mrs. Malone's job search that is inconsistent with her allegation of disability under the Social Security Act."  *Id.* at 21.  Plaintiff cites *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), for the proposition that a claim for Social Security disability benefits can be consistent with some ability to work.  Motion at 21.

Second, Plaintiff disputes the ALJ's finding Plaintiff's "daily activities and inconsistent treatment do[] not support the severity that she alleges."  AR at 22; *see* Motion at 22.  Plaintiff disputes each of the supporting points listed by the ALJ for this proposition, including that "[t]he record reflects that the claimant's treating doctor had stated that the claimant's colitis had been treated successfully,"

motion at 22 (quoting AR at 23) arguing that the medical evidence clearly establishes that Plaintiff was being treated for colitis flare ups during the relevant period, Motion at 22 (collecting cites to AR); that she does not comply with prescribed diet (arguing she does "as much as [she] can," *id.* (citing AR at 57)); and that the ALJ mischaracterizes her testimony regarding her and her husband's caring for 20 cats and four dogs (arguing she does less than the ALJ indicated and her husband does most of the work caring for the animals).  Motion at 22–23.

Third, Plaintiff disputes the ALJ's determination that Plaintiff's daily life and "treatment notes that are in the record do not support that the claimant has the limitations in this area that she has asserted."  AR at 23.  Plaintiff argues the ALJ's determination is based on mischaracterizations of her care for her animals, reaction to moving from her old house, and "a workers' compensation report that refers to a letter [Plaintiff's] boss wrote to her requesting that she provide a doctor's note for any future sick leave due to possible sick leave abuse."  Motion at 23.  Plaintiff also argues that the ALJ's citation to a medical record saying she was "stable" does not invalidate later claims that her symptoms were severe, as a comment as to stability only indicates a lack of change, and not that severe symptoms were not present or episodic.  *See id.*  Plaintiff cites to *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007), for the proposition that "a Social Security claimant's activities of daily living may discredit her testimony regarding symptoms only when either (1) the activities meet the threshold for transferable work skills or (2) the activities contradict her testimony," Motion at 23 (quotation omitted), and argues that the ALJ failed "to engage meaningfully with either aspect of the standard."  *Id.* at 24.

### 6.  If Plaintiff's improperly rejected testimony is credited as true, the Court should remand for payment of benefits

Plaintiff argues that the ALJ improperly disregarded her testimony as not credible, and therefore that it should be credited as true.  Motion at 24.  Plaintiff argues that if that testimony is credited as true, it establishes that she is unable to work on a "regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule," and therefore is entitled to benefits under 20 C.F.R. § 404.1545(b) and SSR 96-8p.  *Id.* (quotation omitted).  Combined with the VE's testimony that three unscheduled absences would not be tolerated by any employer, Plaintiff argues, her credited-as-true testimony establishes that she is disabled.  *Id.*

### 7.   The ALJ's RFC Finding And Vocational Hypothetical Failed To Include All Of Mrs. Malone's Limitations

Finally, Plaintiff argues that "the ALJ's vocational hypothetical did not accurately reflect [Plaintiff's] actual limitations," as it "failed to include limitations assessed by Drs. Shaw and Brusatori, and it failed to include Plaintiff's allegations."  Motion at 25.  Therefore, under 9th Circuit law, Plaintiff argues "the VE's testimony that Plaintiff can perform other work has no evidentiary value."  *Id.*

### B.   Defendant's motion for remand

Defendant styles her motion as "join[ing] in Plaintiff's request for remand for further administrative proceedings and hereby moves for remand of this case to allow the Commissioner to reevaluate Plaintiff's claim."  Def. Motion at 3.

Defendant argues that remand to the ALJ is "necessary to permit the ALJ to clarify his findings."  Def. Motion at 3.  Defendant states:

> In his decision, the ALJ noted that Dr. Shaw and a physician's assistant submitted a co-signed medical source statement (AR 24, 612-15). However, in summarizing their opinion regarding Plaintiff's functional limitations, the ALJ mistakenly stated that they opined Plaintiff's symptoms would likely cause her to be off task 5% of the workday, rather than 10% of the workday, and did not address other functional limitations included in their opinion (AR 24, 612-15). In addition, when the ALJ evaluated Dr. Brusatori's opinion, it appears that the ALJ relied, in part, on a record completed by a different medical source which inconsistently indicated that Plaintiff was not taking any psychotropic and also taking psychotropic medication daily (AR 24, 602). Thus, remand is necessary so that the ALJ can reevaluate these opinions and determine whether this would affect his [sic] residual functional capacity finding and determination that Plaintiff could perform her past relevant work, and if necessary, make findings at step five to determine whether jobs exist in significant numbers in the national economy that Plaintiff can perform.

*Id.* at 3–4.  Defendant proposes the following language on remand:

> Upon remand, the Appeals Council will instruct the Administrative Law Judge (ALJ) to further consider the medical source opinions provided by Elizabeth Shaw, M.D., as well as Leyla Brusatori, Ph.D. The ALJ should also reassess Plaintiff's residual functional capacity, if necessary, and determine if Plaintiff can perform her past relevant work, and if not, whether jobs exist in significant numbers in the national economy that Plaintiff can perform.

*Id.* at 4.

Defendant disputes Plaintiff's request for remand for benefits, arguing that:

judicial determination of disability is appropriate only when an ALJ fails to provide legally sufficient reasons for rejecting challenged evidence, there are no outstanding issues that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled were the evidence in question credited.

*Id.* (citing *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)).  Defendant does not directly argue that the ALJ provided legally sufficient reasons for *rejecting* any particular evidence, as opposed to mistakenly summarizing certain evidence inaccurately, but maintains that "there are outstanding issues in this case that must be resolved."  Def. Motion at 4.  Defendant also cites *INS v. Ventura*, 537 U.S. 12, 16 (2002) for the proposition that "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."  *Id.*

## C.    Plaintiff's Reply and Opposition to Defendant's Motion to Remand

Plaintiff disputes Defendant's styling her motion as "join[ing]" Plaintiff in requesting remand, as Plaintiff "has *not* made any request to remand for further administrative proceedings that the Commissioner may join."  Pl. Reply at 2 (emphasis in original).  Plaintiff summarizes Defendant's Motion as "conced[ing] reversible error," Pl. Reply at 2, and notes that Defendant "does not address [Plaintiff's] argument that the ALJ improperly rejected the credibility of her allegations."  *Id.* at 3 n.2.  Plaintiff characterizes Defendant's Motion as a "request for a mulligan" that "should be denied because it is contrary to circuit precedent, most recently addressed in *Garrison v. Colvin*."  Pl. Reply at 3 (citation omitted).

### 1.    The Three Conditions of the Credit-As-True Rule Have Been Satisfied,

Plaintiff argues that her case meets the three conditions of the credit-as-true rule, recently clarified in *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014), and that the Court is therefore required to credit Dr. Shaw's and Dr. Brusatori's opinions, and Plaintiff's own testimony, as true. Pl. Reply at 2–6.  Plaintiff likens her case to *Garrison*, in which the ALJ improperly rejected the medical opinion of a doctor (and misunderstood another), improperly rejected the medical opinion of a nurse practitioner, and improperly rejected the testimony of the Plaintiff about the severity of her pain.  *See* Pl. Reply at 4; *Garrison*, 759 F.3d at 1013.  Plaintiff argues that as in *Garrison*, here:

the ALJ found the claimant not disabled at step four of the sequential analysis, . . . the ALJ also improperly rejected the

> opinions of the claimant's physicians, . . . [and] the vocational expert's testimony sufficiently addressed the improperly rejected evidence to establish that if the improperly rejected evidence were credited as true, then the claimant was disabled.

Pl. Reply at 4.  Plaintiff argues that as in *Garrison*, the appropriate remedy is remand for the calculation of benefits.  *Id.*  Plaintiff argues each of the three parts of the credit-as-true rule in turn,

> each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020.

First, Plaintiff argues that "there is no need to develop the record or convene further administrative proceedings," Pl. Reply at 6, quoting a passage from *Garrison* to rebut Defendant's argument that further proceedings are necessary so "the ALJ can reevaluate [the rejected] opinions and determine whether this would affect his residual functional capacity finding" and analysis at steps four and five.  Pl. Reply at 6–7 (quoting Def. Motion at 3–4).  The *Garrison* passage suggests that "allowing the ALJ to have a mulligan" does not "qualif[y] as a remand for a 'useful purpose' under the first part of credit-as-true analysis."  Pl. Reply at 4 (quoting *Garrison*, 759 F.3d at 1021.

Second, Plaintiff argues that the ALJ improperly rejected Plaintiff's testimony and the opinions of Drs. Shaw and Brusatori, and that Defendant concedes as much.  *Id.* at 7.  Plaintiff notes that Defendant "did not address the ALJ's rejection of [Plaintiff's] testimony, but Plaintiff has shown that the ALJ improperly rejected her testimony" in Plaintiff's Motion.  *Id.*

Third, Plaintiff argues that "if the improperly discredited evidence were credited as true, it is clear that the ALJ would be required to find Plaintiff disabled on remand."  *Id.* Plaintiff refers to her opening brief's arguments that Dr. Shaw's opinions that: (1) Plaintiff would be off-task ten percent of the workday; and (2) Plaintiff would have three unscheduled absences per month, would each be dispositive to determining disability.  *Id.* at 7–8.  Plaintiff also refers to her opening brief regarding Dr. Brusatori's opinions that Plaintiff has moderately severe limitations limiting her ability to complete a normal workday and is disabled under Social Security Ruling 96-9p.  *Id.*

United States District Court
Northern District of California

1   at 8–9.  Plaintiff also argues that her own testimony about her inability to work on a regular and

2   continuing basis is supported by the medical evidence and, if credited as true, also warrants a

3   directed finding of disability.  *Id.* at 9.

### 2.  The Record as a Whole Does Not Create a Serious Doubt That Mrs. Malone Is Disabled

6       As Plaintiff notes, "*Garrison* requires addressing the question [of] whether the Court

7   should nonetheless exercise 'flexibility' under *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003),

8   and remand for further proceedings."  Pl. Reply at 9.  "*Connett* allows flexibility to remand for

9   further proceedings when the record as a whole creates serious doubt as to whether the claimant is,

10  in fact, disabled within the meaning of the Social Security Act."  *Garrison*, 759 F.3d at 1021.

11  Plaintiff argues that Defendant "has identified no evidence and advanced no argument that casts

12  into serious doubt [Plaintiff's] claim to be disabled."  Pl. Reply at 9.  Plaintiff summarizes:

> The record reflects that since her alleged onset, she has been afflicted with disabling colitis and depression. She has been unable to sustain employment on a regular and continuing basis, and has lost at least two jobs as a result of impairment-related absences. Both of her treating physicians, Drs. Shaw and Brusatori, after reviewing her records and treating her, have assessed restrictions that, when credited, establish that Mrs. Malone is disabled. Accordingly, there is no reason to doubt that Mrs. Malone has been disabled since June 1, 2008, as alleged–well before her date last insured of December 31, 2010.

18  *Id.* at 9–10.

### D.   Defendant's Reply

20      Defendant first reiterates her argument that the Court should remand for further

21  proceedings because "[i]t is the Commissioner, not a court, who is the factfinder for Social

22  Security claims."  Def. Reply at 2.  Defendant also notes that, whether or not the credit-as-true

23  conditions are satisfied, "As a matter of record, the Commissioner disagrees with the credit-as-true

24  rule."  *Id.*

25      Defendant second argues that even if applying the credit-as-true rule, the Court should

26  exercise flexibility under *Connett*, as "the overall record raises serious doubt as to whether

27  Plaintiff is disabled, and this case should therefore be remanded for further proceedings."  *Id.* at 3.

28  With regard to Dr. Shaw, Defendant argues that "while Plaintiff asks this Court to credit certain

United States District Court
Northern District of California

United States District Court
Northern District of California

1  portions of Dr. Shaw's opinion regarding Plaintiff's functional limitations, other portions of [her]

2  opinion indicate that Plaintiff was not as limited as alleged." *Id.* As examples, Defendant cites

3  Dr. Shaw's opinion that Plaintiff's prognosis was "good," that her cramping was only intermittent

4  cramping (and precipitated by stress), that "she did not currently take any medication for colitis,

5  and that emotional factors did not contribute to the severity of her symptoms and functional

6  limitations." *Id.* (citing AR at 24, 612). Defendant contrasts Dr. Shaw's opinion that Plaintiff

7  would be off-task 10% of the workday with her opinion that Plaintiff "was capable of low stress

8  work." *Id.* (citing AR 614). Defendant also notes that Dr. Shaw "only began treating Plaintiff in

9  April 2011, after the relevant period," and based her opinion on limitations existing since 2006 on

10  a review of Plaintiff's records, but that "two other physicians who reviewed the record in 2011

11  opined that Plaintiff had no severe physical impairment." *Id.* (citing AR 532 (case analysis by M.

12  R. Friedman, M.D.), 569 (case analysis by M. Tambellini, M.D.), 612-15). Defendant also states

13  that "one physician noted that Plaintiff's colitis was successfully treated with [P]epto [B]ismol and

14  Entocort, and Dr. Shaw reported in October 2011 that Plaintiff was not taking any medication for

15  her colitis (AR 532, 612)." Def. Reply at 4.

16       Defendant next argues that the "evidence regarding Plaintiff's mental health, like the

17  physical evidence, similarly raises serious doubt as to whether Plaintiff is disabled." Def. Reply at

18  4. Defendant cites to Dr. Tahami's evaluation of Plaintiff in January 2007, who:

19       opined that Plaintiff was not temporarily totally disabled based on a
         psychiatric illness, that she "could actually benefit from returning to
20       some type of employment preferably not in contact with her
         previous supervisors," and that her condition was not permanent and
21       stationary since she had not received adequate and aggressive
         psychiatric treatment (AR 25, 389-90). In August 2008, Dr. Tahami
22       reported that he was unable to change his opinion without having
         additional information (AR 25, 391).

23  *Id.* Defendant additionally cites to records for Dr. Valerie Fox as raising "serious doubts as to

24  whether Plaintiff is disabled," and which recount Plaintiff's good prognosis, thoughts about

25  returning to work, intention to start a home business, and progress toward her goals. *Id.* (citing

26  AR 483-89). Defendant notes that Dr. Fox's treatment records are from the relevant period,

27  whereas Dr. Brusatori only treated Plaintiff in 2011, after the relevant period (AR 621-22)." *Id.*

28  Defendant also notes positive statements from Dr. Brusatori's initial mental status examination of

1    Plaintiff in May 2011 that Defendant suggests are inconsistent with, or at least raises doubts about,

2    a finding of disability.  *Id.* at 5

3           Finally, Defendant disputes Plaintiff's argument that the ALJ improperly rejected

4    Plaintiff's testimony about her symptoms, and argues that the ALJ "provided legally sufficient

5    reasons for finding [Plaintiff] not fully credible."  *Id.* at 5–6.  Defendant argues that Plaintiff's

6    testimony that she was looking for work, her bookkeeping for her husband, and her intention to

7    start a bookkeeping business indicated that she was not as limited as claimed.  *Id.* at 6.  Defendant

8    also noted that Plaintiff did not always follow her prescribed diet, that some of the medical records

9    indicated improvement in Plaintiff's mental health with medication, and that Plaintiff testified that

10   her medication helped and caused no side effects.  *Id.*  Defendant therefore argues that remand

11   crediting Plaintiff's testimony as true is not appropriate, but even if so credited, "because the

12   overall record raises serious doubt as to whether Plaintiff is disabled, an award of benefits is

13   inappropriate, and this Court should remand for further proceedings."  *Id.*

14   **V.    APPLICABLE LAW**

15       **A.    Legal Standard Under 42 U.S.C. § 405(g)**

16          When asked to review the Commissioner's decision, the Court takes as conclusive any

17   findings of the Commissioner which are free from legal error and supported by "substantial

18   evidence."  42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind

19   might accept as adequate to support a conclusion," and it must be based on the record as a whole.

20   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere

21   scintilla," *id.*, but "less than a preponderance."  *Desrosiers v. Sec'y of Health and Human Servs.*,

22   846 F.2d 573, 576 (9th Cir. 1988).   Even if the Commissioner's findings are supported by

23   substantial evidence, they should be set aside if proper legal standards were not applied when

24   weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

25   1978).  In reviewing the record, the Court must consider both the evidence that supports and

26   refutes the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996)

27   (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

28          If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

United States District Court
Northern District of California

23

1   the Court may remand for further proceedings or for a calculation of benefits. *See, e.g.*, *Garrison*

2   *v. Colvin*, 759 F.3d at 1019−21 (9th Cir. 2014).

3       **B.   Weight assigned to medical opinions and the standard to reject them**

4       "In disability benefits cases . . . physicians may render medical, clinical opinions, or they

5   may render opinions on the ultimate issue of disability—the claimant's ability to perform

6   work." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted). "If a treating or

7   examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

8   by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v.*

9   *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  An ALJ can satisfy the "substantial

10  evidence" requirement by "setting out a detailed and thorough summary of the facts and

11  conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick,* 157

12  F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own

13  interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

14  Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons

15  for crediting one medical opinion over another, he errs. *See Nguyen v. Chater,* 100 F.3d 1462,

16  1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it

17  little weight while doing nothing more than ignoring it, asserting without explanation that another

18  medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a

19  substantive basis for his conclusion.  *See id.*

20      **C.   The standard to assess the credibility of a claimant's testimony regarding**
             **subjective symptoms**

21

22      An ALJ engages in a two-step analysis to determine whether a claimant's testimony

23  regarding subjective symptoms is credible. "First, the ALJ must determine whether the claimant

24  has presented objective medical evidence of an underlying impairment 'which could reasonably be

25  expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028,

26  1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)

27  (internal quotation marks omitted)). In this analysis, the claimant is not required to show "that her

28  impairment could reasonably be expected to cause the severity of the symptom she has alleged;

United States District Court
Northern District of California

24

1    she need only show that it could reasonably have caused some degree of the symptom." *Smolen v.*

2    *Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Nor must a claimant produce "objective medical

3    evidence of the pain or fatigue itself, or the severity thereof." *Id.*

4         If the claimant satisfies the first step of this analysis, and there is no evidence of

5    malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only

6    by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see*

7    *also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ( "[U]nless an ALJ makes a

8    finding of malingering based on affirmative evidence thereof, he or she may only find an applicant

9    not credible by making specific findings as to credibility and stating clear and convincing reasons

10   for each."). This is not an easy requirement to meet: "The clear and convincing standard is the

11   most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278

12   F.3d 920, 924 (9th Cir. 2002).

13        **D.    The credit-as-true rule**

14        Usually, "[i]f additional proceedings can remedy defects in the original administrative

15   proceeding, a social security case should be remanded." *Lewin v. Schweiker,* 654 F.2d 631, 635

16   (9th Cir. 1981). The Social Security Act, however, makes clear that courts are empowered to

17   affirm, modify, or reverse a decision by the Commissioner "with *or without* remanding the cause

18   for a rehearing." 42 U.S.C. § 405(g) (emphasis added).

19        The 9th Circuit has established that:

20             [W]here there are no outstanding issues that must be resolved before
               a proper disability determination can be made, and where it is clear
21             from the administrative record that the ALJ would be required to
               award benefits if the claimant's [improperly discredited] testimony
22             were credited, we will not remand solely to allow the ALJ to make
               specific findings regarding that testimony. Rather, we will . . .  take
23             that testimony to be established as true.

24   *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). "[T]he credit-as-

25   true rule applies to medical opinion evidence, not only claimant testimony." *Garrison v. Colvin*,

26   759 F.3d 995, 1020 (9th Cir. 2014) (citing *Hammock v. Bowen*, 879 F.2d 498 (9th Cir. 1989)).

27        The credit-as-true rule is applied via a three-part standard:

28             each part of which must be satisfied in order for a court to remand to
               an ALJ with instructions to calculate and award benefits: (1) the

United States District Court
Northern District of California

1

2

3

> record has been fully developed and further administrative
> proceedings would serve no useful purpose; (2) the ALJ has failed to
> provide legally sufficient reasons for rejecting evidence, whether
> claimant testimony or medical opinion; and (3) if the improperly
> discredited evidence were credited as true, the ALJ would be
> required to find the claimant disabled on remand.

4   *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).  However, the credit-as-true rule does not

5   mandate remand for benefits whenever its three-part test is met.  *Connett v. Barnhart*, 340 F.3d

6   871, 876 (9th Cir. 2003) (the Court has "some flexibility in applying the 'crediting as true'

7   theory").  *Connett's* "flexibility" is properly understood:

8

9

10

11

12

13

14

> as requiring courts to remand for further proceedings when, even
> though all conditions of the credit-as-true rule are satisfied, an
> evaluation of the record as a whole creates serious doubt that a
> claimant is, in fact, disabled. That interpretation best aligns the
> credit-as-true rule, which preserves efficiency and fairness in a
> process that can sometimes take years before benefits are awarded to
> needy claimants, with the basic requirement that a claimant be
> disabled in order to receive benefits. Thus, when we conclude that a
> claimant is otherwise entitled to an immediate award of benefits
> under the credit-as-true analysis, *Connett* allows flexibility to
> remand for further proceedings when the record as a whole creates
> serious doubt as to whether the claimant is, in fact, disabled within
> the meaning of the Social Security Act.

15   *Garrison*, 759 F.3d at 1021.

16   ## VI.    ANALYSIS

17   ### A.    The ALJ's rejection of the doctors' opinions

18   #### 1.    Dr. Shaw

19   The Court first considers Plaintiff's argument that the ALJ improperly rejected Dr. Shaw's

20   medical opinions regarding the impact of Plaintiff's colitis on her ability to work.  Defendant

21   concedes that "the ALJ mistakenly stated that they opined Plaintiff's symptoms would likely cause

22   her to be off task 5% of the workday, rather than 10% of the workday, and did not address other

23   functional limitations included in their opinion (AR 24, 612-15)."  Def. Motion at 3.  Defendant

24   does not specifically address the ALJ's explicit rejection of Dr. Shaw's opinion that Plaintiff

25   "would miss three days [of work] per month as it is purely speculative and without any rationale,"

26   AR at 24, or rebut any of Plaintiff's arguments regarding that rejection.  Accordingly, the Court

27   finds that the ALJ did not provide "specific and legitimate reasons that are supported by

28   substantial evidence" to disregard Dr. Shaw's opinions, and credits as true that Plaintiff:

United States District Court
Northern District of California

1          1.      Would be off task 10% of a typical workday.

2          2.      Would have three unscheduled absences per month.

3          3.      Would have additional functional limitations, including requiring access to a

bathroom at work, and the ability to take unscheduled bathroom breaks of 20-30 minutes with

varying frequency.

### 2.  Dr. Brusatori

The Court next considers Plaintiff's argument that the ALJ improperly rejected Dr.

Brusatori's medical opinions regarding Plaintiff's mental health contained in her October 2011

medical source statement.  AR Ex. 17F (pp. 617–22).  Defendant concedes that:

> when the ALJ evaluated Dr. Brusatori's opinion, it appears that the
> ALJ relied, in part, on a record completed by a different medical
> source which inconsistently indicated that Plaintiff was not taking
> any psychotropic and also taking psychotropic medication daily (AR
> 24, 602). Thus, remand is necessary so that the ALJ can reevaluate
> these opinions . . . .

Def. Motion at 3.  Despite that concession characterizing the ALJ's rejection as based on a

*mistaken* comparison of two inconsistent medical records, Defendant does not address the ALJ's

explicit rejection of Dr. Brusatori's medical source statement opinions (e.g., diagnosing four

moderately severe limitations and a GAF score of 50) on the basis that they were "perplexing" and

contradicted Dr. Brusatori's earlier progress note entry (Ex. 15F at 7).  AR at 24 (calling out the

contrast between the medical source statement and the earlier note that Plaintiff's move was the

"best thing that ever happened" to her and that she was "managing her mental health well through

the transition").  Nor does Defendant address Plaintiff's arguments regarding that rejection.

Accordingly, the Court finds that the ALJ did not provide "specific and legitimate reasons that are

supported by substantial evidence" to disregard Dr. Brusatori's opinions that Plaintiff had

"moderately severe"[5] limitations with:

1.   The ability to complete a normal workday and work week without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

---

[5] A "moderately severe" limitation is defined on the form Dr. Brusatori filled out as one "which seriously interferes with the individual's ability to perform the designated activity, and precludes the ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week or an equivalent work schedule."

United States District Court
Northern District of California

unreasonable number and length of rest periods.

2.  The ability to accept instructions and to respond appropriately to criticism from supervisors.

3.  The ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.

4.  The ability to respond appropriately to changes in the work setting.

AR at 618–19.  The Court also credits as true that Plaintiff had "moderate" limitations with respect to:

1.  The ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure).

2.  The ability to sustain ordinary routine without special supervision.

3.  The ability to interact appropriately with the general public.

4.  The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

5.  The ability to set realistic goals or to make plans independently of others.

*Id.*  Additionally, the Court credits as true Dr. Brusatori's opinion that with regard to the mental demands of unskilled work, Plaintiff had "substantial loss"[6] in her ability to:

1.  Make judgments that are commensurate with the functions of unskilled work, *i.e.*, simple, work-related decisions.

2.  Respond appropriately to supervision, co-workers and usual work situations.

---

[6] "POMS DI 25020.010(A)(3)(b) defines the term, 'substantial loss' as follows— 'Substantial loss' cannot be precisely defined. It does not necessarily relate to any particular adjective, number, or percentage. In practical terms, an individual has a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided."  AR 619 (the medical source statement form).  The rest of that section, not included on the form, goes on to say: "This requires professional judgment, on the basis of the evidence in file in each case. The impairment in a claim of this type may meet or equal the listed medical criteria. Therefore, before making a determination that includes vocational evaluation, the adjudicator should discuss the case with a psychiatrist or psychologist to learn whether a significant part of the evidence had been previously overlooked or underrated."  POMS DI 25020.010(A)(3)(b).

28

3.   Deal with changes in a routine work setting.

AR at 620.[7]

**B.     The ALJ's rejection of Plaintiff's testimony**

The Court next considers Plaintiff's claim that the ALJ improperly rejected the credibility of Plaintiff's allegations regarding the severity of her symptoms.  If there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear[,] and convincing reasons for doing so."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  An "ALJ is not required to believe every allegation of disabling pain," and may use "ordinary techniques of credibility evaluation" to assess the credibility of Plaintiff's allegations, "including examining "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotations omitted).  Here, the ALJ found that there was objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged, AR at 22, but Plaintiff argues that the ALJ did not sufficiently provide specific, clear, and convincing reasons for rejecting Plaintiff's testimony.  The Court agrees.

Plaintiff identifies three paragraphs of the ALJ's decision in which the ALJ described her basis for rejecting Plaintiff's testimony as not credible.  Motion at 20.  In the first full paragraph of page 22 of the ALJ's decision, the ALJ identifies a "discrepanc[y]" in Plaintiff's description regarding the end of her last job in 2008, claiming that Plaintiff testified at the hearing that her job ended to due to excessive absences (caused by her colitis) and that it ended due to work stress.  AR at 22.  Plaintiff never testified that her job ended due to work stress, and therefore no discrepancy exists.  *See* AR 40–61.  The ALJ also suggests "discrepancies" in Plaintiff's

---

[7] "Pursuant to Social Security Ruling 85-15 and/or Social Security Ruling 96-9p and/or POMS DI 25020.010(A)(3)(b), a 'substantial loss' of ability to meet any one of several basic work-related activities on a sustained basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), will severely limit or substantially erode the unskilled occupational base and would warrant or justify a finding of disability."  .

United States District Court
Northern District of California

1   testimony based on Plaintiff's claim to have a hard time focusing on work, seeing a psychologist

2   until she felt she could no longer afford it, and not keeping health insurance from her previous job

3   when her worker's compensation claim settled.  *Id.*  Again, no discrepancies exist.  To the extent

4   the ALJ implies that Plaintiff would not plausibly have accepted a larger cash settlement over

5   continuing health coverage when settling her claim unless her symptoms were not actually severe,

6   the Court finds the implication is far from "clear and convincing evidence" undermining

7   Plaintiff's credibility.  The ALJ next suggests a discrepancy between Plaintiff's claim for

8   disability, having "signed up with employment agencies," and Plaintiff's active search for work.

9   *Id.*  Again, the ALJ misstates the record; when specifically asked by the ALJ if she was signed up

10  with "any employment agencies," AR at 43, Plaintiff did not reply in the affirmative, and clarified

11  that she was signed for a "work program."  *Id.*  Regardless, as Plaintiff argues, Plaintiff's claim for

12  disability and her ongoing job search do not create a discrepancy in Plaintiff's claims, as she could

13  be searching for part-time work or employment that is not inconsistent with a finding of disability

14  under the Social Security Act.  *See* Motion at 21 (citing *Cleveland v. Policy Management Systems*

15  *Corp.*, 526 U.S. 795 (1999)).

16      The ALJ suggests a discrepancy between Plaintiff's claims to have colitis, to be taking

17  medication for it, and to still have colitis "attacks," on the one hand—and the "record reflect[ing]

18  that the claimant's treating doctor had stated that the claimant's colitis had been treated

19  successfully (Exhibit 2F)," on the other.  *Id.*  However, as Plaintiff argues, "[f]rom [AR] 314

20  through 349 nearly every progress note [in Ex. 2F] lists COLITIS, COLLAGENOUS' or

21  'DIARRHEA' either as the primary encounter diagnosis or on the "Active Problem List.'"

22  Motion at 22 (collecting AR cites).  There are medical records indicating that one particular flare-

23  up, in May 2010, had been treated effectively with medication.  *See* AR at 338–41. A flare-up

24  being controlled by medication, however, does not create a discrepancy with Plaintiff's testimony

25  at the hearing that she still has colitis attacks and that she takes Pepto Bismol for them. To the

26  extent the ALJ was suggesting Plaintiff's colitis has been cured, she did not any specific evidence

27  supporting that claim.

28      The ALJ raises three more bases for rejecting Plaintiff's credibility in this paragraph.

United States District Court
Northern District of California

30

United States District Court
Northern District of California

First, the ALJ notes that Plaintiff "testified that she is not always compliant to the diet that has been prescribed." AR at 23. Second, the ALJ refers to Plaintiff's care for her pets: that she "testified that she takes care of twenty cats and four dogs in the kennels that her and her husband have on their property. She stated that she feeds and cleans the kennels of these animals." *Id.* Third, the ALJ raises Plaintiff's ability to manage daily activities (that Plaintiff "is able to shop, care for herself, make her own meals, and have lunch with her mother," AR at 23 (referring to Plaintiff's husband's third-party function report). The Court addresses Plaintiff's diet, care for the pets, and her daily life below.

In the second full paragraph on page 23 of the ALJ's decision the ALJ addresses the credibility of Plaintiff's mental health claims, and in particular her claim that "she is unable to work due to her depression." AR at 23. The ALJ states that "the limited treatment notes that are in the record do not support that the claimant has the [asserted] limitations" and "show that the claimant has been diagnosed with depression but reported to her therapist an improvement with her symptoms when her Prozac dosage was increased (Exhibit 2F)." *Id.* The ALJ also cites to a "supplemental psychiatric report that was done for workers' compensation purposes" which "refers to a letter the claimant's boss wrote to her requesting that she provide a doctor's note for any future sick leave due to possible sick leave abuse." *Id.* The ALJ also states that, despite Plaintiff's claims, medical records show that she "is not in any acute distress with appropriate psychiatric affect and congruent mood," her "current medical regimen is stable," and that she "recently reported to her counselor that her symptoms have improved since she moved to her new home and stated 'it is the best thing that ever happened.'" Despite the ALJ's claims, these citations to the medical record establish only that Plaintiff's symptoms can be episodic, not that they never existed or that Plaintiff exaggerated their magnitude. "That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). None of the records cited by the ALJ directly contradict Plaintiff's statements by, for example, stating that Plaintiff's symptoms are always, or even typically, mild. That her previous boss required a doctor's note for future absences due to

31

United States District Court
Northern District of California

1    possible sick leave abuse is *suggestive* of credibility issues, but standing alone, does not discredit

2    Plaintiff's testimony.  The ALJ did not, for example, cite evidence showing Plaintiff's absences

3    subsequently reduced dramatically, or cite medical records indicating Plaintiff sought doctor's

4    notes for future absences but was denied by her caregivers because she was malingering.

5    　　　The ALJ also reiterates in this paragraph that Plaintiff "is able to care for herself and the

6    animals on her property."  With regard to Plaintiff's ability to care for herself, the Ninth Circuit

7    "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . .

8    does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*,

9    260 F.3d 1044, 1050 (9th Cir. 2001).  "[D]aily activities may be grounds for an adverse credibility

10   finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving

11   the performance of physical functions that are transferable to a work setting,'" or if they

12   "contradict his other testimony."  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  Here, the

13   ALJ's description of Plaintiff's daily activities (shopping, caring for herself, making her own

14   meals, having lunch with her mother) does not contradict her other testimony or reveal she is

15   capable of skills transferable to a work setting.

16   　　　That Plaintiff "is not always compliant to the diet that has been prescribed," AR at 23,

17   would be relevant to a determination of her credibility.  "[A]n unexplained, or inadequately

18   explained, failure to seek treatment or follow a prescribed course of treatment . . . can cast doubt

19   on the sincerity of the claimant's pain testimony."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

20   1989).  The full exchange during the hearing went as follows:

             Q: Do you follow a recommended diet?
21           A: Bland.
             Q: You do?
22           A: I - - well, yeah, I'm supposed to.
             Q: Do you follow it, though?
23           A: I do, as much as I can.

24   AR at 56–57.  Contextually, "[a]s much as I can" indicates that Plaintiff does not adhere to her diet

25   one hundred percent of the time, but it also does not suggest Plaintiff generally disregards her

26   doctors' medical advice.  Moreover, though Plaintiff's failure to follow a prescribed course of

27   treatment is unexplained, it was the ALJ who passed on an opportunity to ask for an explanation.

28   This exchange does not provide clear and convincing evidence to reject Plaintiff's testimony

                                                    32

regarding the severity of her symptoms.

Finally, the Court considers whether Plaintiff's testimony about taking care of 20 cats and four dogs was a sufficient reason to disregard Plaintiff's testimony. The ALJ prompted Plaintiff: "[W]alk me through a typical day for you. What do you do with your time?" Plaintiff responded, "I just recently relocated after living in a house for 20 years, and so, I'm trying to put my house together. I have several animals that I have to take care of . . . ." AR at 52. Plaintiff explained that she and her husband have 20 cats and four dogs, and that they keep the dogs in two kennels that they made from a converted sunroom. Plaintiff argues in her motion that she "takes care of only 'the puppy and another small dog,'" Motion at 23 (quoting AR at 53), but at the hearing she testified *she* has "several animals that I have to take care of," that *she* has "two big dogs and two little dogs," and that her "role in caring for the pets" is that "I care for the dogs." AR at 53–54. Her other responses indicate that she and her husband share some of the responsibilities for caring for the pets. *See id.*

The ALJ states that Plaintiff's care for the pets, along with her other daily activities, indicate that she leads a "very active life" and suggests it is contradictory to her testimony as to her inability to work due to her colitis and her inability to work due to her depression. AR at 23. Plaintiff's care for her many pets (two dogs, by her admission in her pleadings; two more, based on her clear hearing testimony; and some share of responsibility for the 20 cats and maintenance of the kennels themselves) could indicate a significant activity level, and potentially casts doubt on Plaintiff's testimony regarding the full debilitation effect of her colitis and depression, and her claim that she cannot afford health insurance or continued medical treatment. AR at 49–50. It suggests a level of activity higher than rejected as the basis for the ALJ's credibility determination in *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (reading, watching television, and coloring in coloring books) but lower than the hypothetical posed in *Fair v. Bowen*. 885 F.2d 597, 603 (9th Cir. 1989) ("If the claimant runs marathons, as an extreme example, an ALJ could reasonably assume that the claimant's pain is not so debilitating as to prevent him from working."). However, the ALJ did not draw a specific inference from Plaintiff's care for her pets that she contradicted her other testimony or that the activities required for their care met the threshold for transferable

work skills.  In particular, the ALJ did not indicate how these activities would be inconsistent with

Plaintiff's claims in particular, which Plaintiff has consistently alleged are episodic and cyclical in

their severity.  *See supra*.  Plaintiff alleges her symptoms would interfere with a regular, routine

work schedule, but that does not necessarily mean they would interfere with the flexible demands

of caring for even a very large number of animals.  Accordingly, the Court finds that the ALJ did

not provide specific, clear, and convincing reasons for rejecting Plaintiff's testimony based on her

testimony regarding her daily activities, including her care for her pets, and credits it as true.

### C.    Crediting the improperly rejected evidence as true

The Court next considers whether the ALJ would be required to find Plaintiff disabled on

remand if the opinions of Dr. Shaw and Dr. Brusatori, and the testimony of the Plaintiff, are

credited as true.

If Dr. Shaw's opinion that Plaintiff would miss three unscheduled days of work per month

is credited as true, the ALJ would be required to find Plaintiff disabled.  The vocational expert

testified that "no employer is going to tolerate this level of absences." AR at 66.  However, Dr.

Shaw's opinion that Plaintiff would be off task 10% of the workday is not similarly dispositive.  The

VE testified that, "I think five percent would be acceptable, I think at ten percent, especially when

you're talking about jobs like medical secretary, administrative assistant, receptionist, I think they

would be [INAUDIBLE]."  AR at 66.  From context it is clear that the VE was testifying that, as

opposed to the five percent level that would be acceptable, ten percent would be less acceptable.  The

VE follows up by saying, "Other work, however, would still be able to be performed."  AR at 67.  The

VE testified that there is no exact percentage which represents the cutoff when no work (of the clerical

type Plaintiff previously performed) would be available, but suggested that "a little bit of slack . . . [is]

acceptable. . .  And I think that holds all the way up to just about 15 percent, and I think if you cross

the 15 percent line, you've lost an employment base completely."  *Id.* at 74.  The VE also testified that

"if you have a person that's going to be off task as much of an hour a day in terms of their output . . .

that's the line."  *Id.*at 76.  One hour per day—60 minutes out of 480— is 12.5% of the workday.  Even

if 12.5%, rather than 15%, is the threshold (with the lower threshold being more favorable for

Plaintiff's claim) crediting Dr. Shaw's opinion only establishes that Plaintiff would be off task ten

1    percent of the workday.  Dr. Shaw's opinion would not establish Plaintiff as disabled without further

2    proceedings.

3           If Dr. Brusatori's opinions are credited as true, they would not establish that Plaintiff is

4    disabled without further proceedings.  Plaintiff argues that the VE's testimony as to being absent

5    from work three days per month "is consistent with Dr. Brusatori's opinion that Mrs. Malone has a

6    moderately severe limitation in the ability to complete a normal workday and workweek without

7    interruptions from psychologically based symptoms and to perform at a consistent pace without an

8    unreasonable number and length of rest periods."  Motion at 18.  But Dr. Brusatori did not opine

9    that Plaintiff would be absent from work three days per month; Dr. Shaw did.  AR at 614.  There

10   is no evidence in the record—credited as true or not—quantifying the absences Plaintiff would

11   have as a result of the limitations about which Dr. Brusatori opined.  Plaintiff alternately argues

12   that "crediting Dr. Brusatori's improperly rejected opinions establishes that Mrs. Malone is

13   disabled under the criteria of Social Security Rulings 85-15 and 96-9p."  *Id.*  Those regulations are

14   inapt.  85-15 applies "[i]f a person has a severe medically determinable impairment which, though

15   not meeting or equaling the criteria in the Listing of Impairments, *prevents the person from doing*

16   *past relevant work*," (emphasis added), and 96-9p applies "once it has been determined that an

17   individual is not engaging in substantial gainful activity and has a 'severe' medically determinable

18   impairment(s) which, though not meeting or equaling the criteria of any listing, *prevents the*

19   *individual from performing past relevant work.*"  (Emphasis added).  By citing to Social Security

20   Rulings that only apply where it has already been established that the claimant cannot perform her

21   past relevant work, Plaintiff begs the question; whether Plaintiff is capable of performing past

22   relevant work is precisely the issue at hand.  Moreover, the VE was not asked questions or

23   hypotheticals regarding the limitations reflected in Dr. Brusatori's medical source statement.  *See*

24   AR at 61–77; 617–21.   Dr. Brusatori opined as to Plaintiff's "moderately severe" and "moderate"

25   limitations in her "ability to perform the designated activity on a regular and sustained basis, i.e., 8

26   hours a day, 5 days a week or an equivalent work schedule," but that alone, even if credited as

27   true, does not prove Plaintiff is disabled.  The VE testified that Plaintiff could have significant

28   limitations in her ability to work on a regular and sustained basis—i.e., could be off task by up to

United States District Court
Northern District of California

1  hour per day—and still be able to perform her past relevant work.  AR at 75–76.  The VE did not

2  testify regarding the effect of the limitations described in Dr. Brusatori's opinions, making a

3  determination as to their effect on Plaintiff's ability to perform past or equivalent work impossible

4  without further proceedings.

5       If Plaintiff's testimony is credited as true, it would not establish that Plaintiff is disabled

6  without further proceedings.  Plaintiff's testimony did not establish that she would have absences

7  from work, times when she would be off task at work, or limitations in her ability to perform work

8  commensurate with the threshold established by the VE.  Plaintiff testified that her previous job

9  "ended due to [her] being absent too many times," AR at 43, and that she expected she "wouldn't

10  be able to keep" a job, even if she got one, "[b]ecause she would be absent from that job." AR at

11  45–46.  Plaintiff's unquantified testimony regarding the end of her previous job, and speculation

12  as to what would happen in a future job, does not establish that her symptoms are actually so

13  severe as to prevent her from working.  As noted, the VE testified that Plaintiff could have

14  significant limitations in her ability to work on a regular and sustained basis and still be able to

15  perform her past relevant work.  The VE was not asked questions or hypotheticals regarding

16  limitations particularly based on Plaintiff's testimony.  *Cf. Garrison*, 759 F.3d at 1022 n.28 (an

17  RFC determination by based on the rejected opinions is not necessary for a Court to direct a

18  finding for benefits, because ALJs "rarely" make determinations based on rejected evidence, but

19  "whether the VE answered a question describing a hypothetical person with the RFC that the

20  claimant would possess were the relevant opinion or testimony taken as true" is relevant to the

21  Court's decision to remand for benefits or for further proceedings); *see also Lingenfelter v. Astrue*,

22  504 F.3d 1028, 1041 (9th Cir. 2007) (Court ordered benefits in part based on "a hypothetical

23  question based on the ALJ's RFC assessment [and] hypothetical questions that incorporated the

24  pain and physical limitations testified to by" the Plaintiff).  Even crediting Plaintiff's testimony

25  regarding her symptom's severity level as true, further proceedings are necessary to determine

26  whether Plaintiff is disabled at that severity level.

27  **D.    "Flexibility" under *Connett***

28       The Court finally considers whether to apply "flexibility" with regard to the credit-as-true

United States District Court
Northern District of California

rule, and remand for further proceedings even where the credit-as-true rule would direct immediate remand for benefits. "[W]hen we conclude that a claimant is otherwise entitled to an immediate award of benefits under the credit-as-true analysis, *Connett* allows flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021. Here, with regard to the opinions of Dr. Shaw, the record has been fully developed and further administrative proceedings would serve no useful purpose; the ALJ failed to provide legally sufficient reasons for rejecting her opinions; and if Dr. Shaw's opinions are credited as true, the ALJ would be required to find the claimant disabled on remand. However, for the reasons discussed below, "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," the Court uses the flexibility afforded it by *Connett* and remands for further proceedings.

First, Dr. Shaw's opinions regarding Plaintiff being off task for ten percent of the day and absent three days per month come in the form of checkboxes on a form with no additional explanation of how Dr. Shaw reached those conclusions. AR at 612–15. "[T]he amount of relevant evidence that supports the opinion [and] the quality of the explanation provided in the opinion" are relevant considerations when evaluating any medical opinion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007); *see also* 20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *cf. Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014) (finding opinions supported by "significant experience with [a patient] and supported by numerous records . . . were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit.") Here, the checkbox-opinions of Dr. Shaw are not "unsupported"; medical records support the idea that Plaintiff would have flare-ups of varying duration and intensity. However, the VE testified that some amount of time off task would be acceptable, so the particular number of unscheduled absences and time off task stated in Dr. Shaw's medical source statement is critical to determining Plaintiff's disability status. Additionally, though Dr. Shaw is a "treating physician," and therefore her opinions are given deference, *e.g.*, *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600

United States District Court
Northern District of California

United States District Court
Northern District of California

(9th Cir. 1999), "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id.* Moreover, in this instance Dr. Shaw began treating Plaintiff in April 2011, and her determinations regarding Plaintiff's symptoms and their severity prior to her date last insured are based on reviewing medical records, rather than personal observation and treatment.

Second, a case analysis by Dr. M. Friedman in April 2011 casts doubt on the severity of Plaintiff's colitis and the underlying diagnosis. AR at 529–32. Dr. Friedman provided his case analysis shortly before Dr. Shaw began treating Plaintiff, and like Dr. Shaw, based his evaluation of Plaintiff's symptoms prior to her date last insured on Plaintiff's medical records. *Id.* Dr. Friedman's notes indicate that despite a history of colitis with intermittent symptoms ("currently controlled by meds"), there was a "remote colonscopy [sic] referenced in MER which only showed hemorrhoids." *Id.* at 531. Dr. Friedman also writes that there is no medical evidence of record "in [the] file to indicate that this condition would prevent current work activity." *Id.*

Third, medical records from Dr. Tahami—cited by the ALJ in her decision, but not discussed as providing the basis for rejecting Dr. Shaw's or Dr. Brusatori's opinions—"create[] serious doubt[s] as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021. Dr. Tahami examined Plaintiff in connection with her workers' compensation claim and reviewed her "Kaiser" medical records. *See* AR at 491–500. Some of Dr. Tahami's notes and determinations contradict the opinions Plaintiff would have the Court credit as true—*e.g.*, Dr. Tahami gives Plaintiff a GAF score of 61, AR at 499, and indicates that Plaintiff quit at least one job at a veterinary hospital (that she alleges she had to leave because of her colitis, *see* AR at 59) because she found the veterinarian she worked with "very demeaning." *Id.* at 493. Dr. Tahami also describes a performance evaluation of Plaintiff from 2005–06 that calls Plaintiff "highly dependable, conscientious, and self initiating in her work often going the extra mile to ensure the clients and clinicians are served to maximum degree possible," *id.* at 391—casting doubt on Dr. Brusatori's opinions regarding Plaintiff's moderate and moderately severe limitations to interact with others and follow work instructions. Dr. Tahami's conclusion in January 2007, confirmed later that same year, was that Plaintiff was "not

United States District Court
Northern District of California

temporarily totally disabled based on psychiatric illness or symptoms" and "can actually benefit from returning to some type of employment, preferably not in contact with her previous supervisors."  AR at 419–28.  Dr. Tahami opined that Plaintiff's depressive state began in 2004, stemming from a workplace incident involving a coworker accused of misconduct (the incident that precipitated her worker's compensation claim). *Id.* Though other factors could have contributed to worsening of Plaintiff's psychological well-being between 2007 and 2010, Dr. Tahami's finding that Plaintiff was not disabled three years after the precipitating event nonetheless creates serious doubts as to her being disabled by it in 2010, another three years later.

Fourth, medical records for Dr. Fox—cited by the ALJ in her decision, but not discussed as providing the basis for rejecting Dr. Shaw's or Dr. Brusatori's opinions—"create[] serious doubt[s] as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Garrison*, 759 F.3d at 1021.  Dr. Fox's psychological treatment notes range from October 2008 to August 2010, encompassing the eleven months immediately prior to Plaintiff's alleged disability onset date.  AR at 25; 263; 483–89.  The handwritten notes appearing at AR 393–411 and 501–28 appear to be Dr. Fox's notes from sessions with Plaintiff.  Several notes related to Plaintiff's employment history and job prospects, and suggest that her lack of work is not necessarily related to her physical or mental symptoms.  For example, one note says that Plaintiff "tried to work after qualified WC[8] injury but was unable to find her niche (3 jobs ea lasted only 3–4 mos)," suggesting that her inability to "find her niche" may have been a reason her previous jobs ended—as compared to Plaintiff's claims that she was unable to keep a job because she would be absent too many times due to her colitis.  AR at 410.  Another note states that, "Tammy has done clerical work for many years.  Enjoys a variety of tasks but likes structure + coworker," weighing against Dr. Brusatori's opinions regarding Plaintiff's ability to work with supervisors and co-workers.  *Id.* at 411.  Several other notes cast doubts as to Plaintiff's disability.  *E.g., id.* at 411 (intending to apply for jobs), 504 (intending to volunteer with the Humane Society in hopes of getting a full-time job); 506 (looking for jobs, including at Petco and Walmart, but "many want

---

[8] Other notes indicate "WC" stands for "workers' compensation."

Spanish," and "this angers [Plaintiff] as she refuses to learn Spanish"), 521 (Plaintiff "has *decided* she will not work (except w/ animals eg Petco, dog world)") (emphasis added), 526 (Plaintiff "has dream of being Vet tech").

Finding that the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act, the Court uses the flexibility afforded it by *Connett* to remand for further proceedings.

## VII.   CONCLUSION

For the foregoing reasons, the Court remands for further proceedings. Upon remand, the Court ORDERS ALJ to further consider the medical source opinions provided by Dr. Shaw and Dr. Brusatori. The ALJ should also reassess Plaintiff's residual functional capacity, if necessary, and determine if Plaintiff can perform her past relevant work; and if not, whether jobs exist in significant numbers in the national economy that Plaintiff can perform.

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendant's motion for remand is GRANTED IN PART, and the matter is remanded for further consideration consistent with this order.

**IT IS SO ORDERED.**

Dated: December 30, 2014

JOSEPH C. SPERO
United States Magistrate Judge